UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| STUART CRIBB, GARY FRANKS, SR., MARVIN MARABLE, and MICHAEL YELTON, | Case No. |
| Plaintiffs, | COMPLAINT |
| - against - | JURY DEMAND |
| METROPOLITAN SECURITY SERVICES, INC., d/b/a WALDEN SECURITY, | |
| Defendant. | |

Plaintiffs Stuart Cribb, Gary Franks, Sr., Marvin Marable, and Michael Yelton, by their counsel, Cohen, Weiss and Simon LLP and Barrett Johnston Martin & Garrison, LLC, for their complaint allege as follows:

**INTRODUCTION**

1. Plaintiffs Stuart Cribb, Gary Franks, Sr., Marvin Marable, and Michael Yelton (collectively, "Plaintiffs") each have a hereditary color vision deficiency. Notwithstanding that condition, each successfully held military or law enforcement positions for many years before becoming federal court security officers in the U.S. Marshals Service's Court Security Program. Each Plaintiff's vision was examined before they were accepted as court security officers and tested periodically thereafter. Defendant Metropolitan Security Services, Inc., d/b/a Walden Security ("Defendant" or "Walden") was aware of Plaintiffs' color vision deficiency from the time it hired Plaintiffs. Although Plaintiffs capably performed all of the duties of their positions, Walden fired them on account of their color vision deficiency after the Marshals Service directed that they be removed from the program. This is an action against

Walden to redress its unlawful discharge of Plaintiffs in violation of the Americans with Disabilities Act, as amended, ("ADA"), 42 U.S.C. §12101 *et seq.*

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343.

3. Venue in this Court is proper under 28 U.S.C. §1391 and 42 U.S.C. § 2000e-5 because Defendant has its principal office in this judicial district.

## THE PARTIES

4. Walden Security is a Tennessee corporation with principal offices in Chattanooga, Tennessee. Walden contracted to provide court security services to the United States Marshals Service ("Marshals Service" or "USMS") as part of the Marshals Service's Court Security Program.

5. Plaintiffs were employed by Walden as Court Security Officers ("CSOs") or Lead Court Security Officers ("LCSOs") in the Marshals Service's Court Security Program at courthouses in the Fourth Circuit. As CSOs or LCSOs, Plaintiffs provided security to the federal court system and its judicial officers. At relevant times, including at the time of their termination, Walden was under contract with the United States Marshals Service to provide court security services in the Fourth Circuit.

6. From 2012 until his termination in February 2015, Plaintiff Stuart Cribb ("Cribb") was employed as a CSO by Walden at the U.S. District Court for the District of South Carolina in Columbia, South Carolina.

7. From early 2012 until his termination in April 2015, Plaintiff Gary Franks, Sr. ("Franks") was employed as a CSO by Walden at the U.S. District Court for the Middle District of North Carolina in Greensboro, North Carolina.

8. From 2012 until his termination in June 2014, Plaintiff Marvin Marable ("Marable") was employed as a CSO by Walden at the U.S. Court of Appeals for the Fourth Circuit in Richmond, Virginia. Before being hired by Walden, Marable had been previously employed for approximately seven years in the Court Security Program by other federal contractors.

9. From 2012 until his termination in June 2014, Plaintiff Michael Yelton ("Yelton") was employed as a LCSO by Walden at the U.S. District Court for the Western District of North Carolina in Statesville, North Carolina. Yelton had been previously employed for approximately eight years in the Court Security Program by another federal contractor.

## FACTS

### The Marshals Service's Court Security Program

10. To fulfill its statutory obligation to provide for the security of the federal judiciary the Marshals Services administers the Court Security Program. CSOs are employed by private contractors subject to approval by the USMS. Once accepted into the Court Security Program, the Marshals Service deputizes CSOs so that they function as law enforcement officers with powers of arrest while on duty. Among other things the Marshals Service has established and at different times revised medical standards which CSOs must meet to be eligible to work under a court security contract and to remain employed under such a contract as part of the Court Security Program.

11. USMS has promulgated medical standards for the CSO and LCSO positions, and requires all applicants to the program to submit to a physical examination, the results of which are reviewed by the Marshals Service before a decision is made to accept a candidate into the Court Security Program. CSOs and LCSOs are required to have annual physical examinations, the results of which are reviewed by the Marshals Service.

12. USMS retains sole discretion under its contract with Walden to remove an individual's authorization to work under the contract and in the Court Security Program. Once an individual's authority to work in the Court Security Program has been revoked by USMS for medical reasons or otherwise, that individual may no longer work as a CSO or LCSO.

**The Marshals Service's Vision Requirements**

13. At all relevant times, USMS and Walden were parties to a contract for court security for Courthouses in the Fourth Circuit.

14. USMS, in Section C-14(e)(1) of that contract, requires that: "Corrected distant visual acuity must be 20/30, or better, as measured with both eyes viewing (binocular). Complete loss of vision in one eye is disqualifying. Corrected distant visual acuity must be 20/125, or better, in the worst eye. Ability to distinguish basic colors, as well as shades of color, is required. Normal peripheral vision is required."

**Plaintiffs' Color Vision Disability**

15. Since birth, Plaintiffs have had color vision deficiency, an inherited condition. This condition causes Plaintiffs to be unable to distinguish colors as measured by enhanced color vision testing, such as the Farnsworth D-15 or the Ishihara color vision tests.

16. Plaintiffs' color vision deficiency has never affected their ability to safely and efficiently perform their essential duties as CSOs and/or LCSOs, and at all times they performed

4

to the satisfaction of Walden, the USMS and the judges they were assigned to protect. Plaintiff Cribb adequately performed all of the essential functions of the CSO position for almost three years in the Court Security Program before USMS removed him from the program and Walden terminated his employment. Plaintiff Franks adequately performed all of the essential functions of the CSO position for more than three years in the Court Security Program before USMS removed him from the program and Walden terminated his employment. Plaintiff Marable adequately performed all of the essential functions of the CSO position for fourteen years in the Court Security Program before USMS removed him from the program and Walden terminated his employment. Plaintiff Yelton adequately performed all of the essential functions of the Court Security Program for almost fifteen years in the Court Security Program before USMS removed him from the program and Walden terminated his employment.

17. Nor has Plaintiffs' color vision deficiency ever interfered with their performance in previous jobs, including service in law enforcement and the armed services prior to their employment with Walden. Prior to becoming employed in the Court Security Program, Plaintiff Cribb served for 30 years in the National Guard (which time included 24 years in the South Carolina Highway Patrol). Plaintiff Franks served for three years in the U.S. Army as a First Lieutenant, Field Artillery and then for 25 years in the North Carolina Highway Patrol. Plaintiff Marable served for two years in the Army and then 28 years in the New Haven, Connecticut Police Department. Plaintiff Yelton served for three years in the U.S. Army's Military Police Corps and then 27 years in the North Carolina Highway Patrol.

**USMS Testing of Color Vision**

18. When Plaintiffs applied to the Court Security Program, the Marshals Service required them to submit to a physical examination as part of the application process. That

5

examination included a color vision test. Plaintiff Franks took the initial physical exam with the assistance of color vision corrective lenses (which USMS did not prohibit at that time) and correctly identified 13 out of 14 plates on the Ishihara test. Thereafter, at some point after December 2013, USMS determined that CSO applicants could not use corrective lenses while undergoing color vision testing. The remaining Plaintiffs (Cribb, Marable and Yelton) took their initial exams without using corrective lenses. On his initial physical exam, Cribb correctly identified only four out of nine plates on the Ishihara test. Plaintiff Marable disclosed that he had color vision deficiency and failed the color vision portion of the exam. Plaintiff Yelton failed the color vision portion of the exam.

19. Notwithstanding their color vision deficiency USMS accepted each of the Plaintiffs into the Court Security Program. Notwithstanding their color vision deficiency Walden hired each of the Plaintiffs.

20. After the Marshals Service accepted Plaintiffs into the Court Security Program, it required them to take a physical examination annually. Plaintiffs submitted the results of the physical examination to the contractor, which then transmitted them to the Marshals Service. After USMS awarded Walden the Fourth Circuit contract. Plaintiffs submitted the results of their annual physical examinations to Walden which then transmitted them to the Marshals Service.

21. The Marshals Service accepted Plaintiff Cribb into the Court Security Program in February 2012. In February 2013, Plaintiff Cribb underwent an annual physical examination and correctly identified eight out of 14 plates on the Ishihara test. The Marshals Service did not require him to submit to any additional color vision testing. It deemed him medically qualified.

22. The Marshals Service accepted Plaintiff Franks into the Court Security Program in October 2011. In October 2012 and October 2013, he underwent an annual physical examination with the assistance of color vision corrective lenses and correctly identified 14 out of 14 plates on the Ishihara test both years. The Marshals Service did not require him to submit to any additional color vision testing. It deemed him medically qualified both years. Sometime after October 2013, the Marshals Service began to require on its annual physical examination forms and follow-up physical examination forms that CSOs not wear color vision corrective lenses during color vision testing.

23. The Marshals Service accepted Plaintiff Marable into the Court Security Program in January 2000. Every August for the next thirteen years, Plaintiff Marable underwent annual physical examinations and consistently failed the color vision portion of the test. The Marshals Service did not require him to submit to any additional color vision testing. It deemed him medically qualified year after year.

24. The Marshals Service accepted Plaintiff Yelton into the Court Security Program in August 1999. Every March for the next fourteen years, Plaintiff Yelton underwent annual physical examinations and consistently failed the color vision portion of the test. The Marshals Service did not require him to submit to any additional color vision testing. It deemed him medically qualified year after year.

**USMS Demands Additional Color Vision Testing from Cribb**

25. In February 2014, Plaintiff Cribb underwent an annual physical exam and correctly identified, without the aid of color vision corrective lenses, five out of five plates on the Ishihara color vision test. He submitted the results to Walden, which gave them to the Marshals Service.

7

26. In August 2014 or thereabouts, the Marshals Service issued a Medical Review Form ("MRF") to Walden stating that Plaintiff Cribb had failed to correctly identify any of the 14 plates on his February 2014 physical. USMS directed Plaintiff Cribb to take the Farnsworth D-15 color vision test. The MRF specified that Plaintiff Cribb take the Farnsworth D-15 test without the aid of color vision corrective lenses.

27. Upon information and belief, the Marshals Service and Walden permit nearsighted CSOs and LCSOs to take initial, annual and any follow-up physical examinations with the assistance of corrective lenses. As set out above, the medical standards for nearsightedness reference corrected vision. The Marshals Service and Walden also permit nearsighted CSOs and LCSOs to wear corrective lenses on the job.

28. In September 2014, Plaintiff Cribb returned to the facility that had administered the February 2014 testing to find out how he could have misidentified all of the plates. The facility showed Plaintiff Cribb a copy of the physical, which in fact showed that Cribb had correctly identified five out of five plates. While Plaintiff Cribb was at the office, he asked to be retested under the Ishihara test. This time he correctly identified four out of 14 plates. Plaintiff Cribb submitted the results to Walden, which gave them to the Marshals Service.

29. In October 2014, the Marshals Service issued another MRF to Walden requiring Plaintiff Cribb to take the Farnsworth D-15 test without the aid of color vision corrective lenses. Cribb attempted to comply with the Marshals Service's demand by contacting a total of 21 eye care centers in the vicinity of Columbia, South Carolina. All of those eye care centers advised Cribb that they did not administer the Farnsworth D-15 test. Several of them

8

Case 1:16-cv-00169-TRM-SKL   Document 1   Filed 06/01/16   Page 8 of 15   PageID #: 8

advised Cribb that the Farnsworth D-15 test was used during the World War II era, had not been commonly used for the last 25 years, and was considered obsolete.

30. Unable to find a facility that administered that test, Plaintiff Cribb retook the Ishihara test in December 2014 and correctly identified eight of 14 plates. The physician who administered the test noted that the results "indicat[ed] adequate red/green [color vision]." Cribb submitted the results to Walden, which gave them to the Marshals Service.

**USMS Demands Additional Color Vision Testing from Franks**

31. In October 2014, Plaintiff Franks underwent an annual physical exam and correctly identified nine out of 14 plates on the Ishihara color vision test. This was the first time Plaintiff Franks had taken the test without the assistance of color vision corrective lenses. Plaintiff Franks submitted the results to Walden, which gave them to the Marshals Service.

32. In January 2015, the Marshals Service issued an MRF to Walden stating that Franks had correctly identified nine out of 14 plates on his October 2014 physical and ordering him to take the Farnsworth D-15 color vision test. The MRF specified that Plaintiff Franks take the Farnsworth D-15 test without the aid of color vision corrective lenses.

33. The physician who generally administers Plaintiff Franks' color vision tests informed Plaintiff Franks that he did not have the Farnsworth D-15 color vision test, which he described as "outdated." Eventually, the physician was able to borrow the test from a physician friend and administer it to Franks in March 2015. In his assessment of the exam results, the physician noted that Franks "appear[ed] to have a slight protan deficit which means blue green deficit. But see no reason why he shouldn't be considered a passing grade." Plaintiff Franks submitted the results to Walden, which gave them to the Marshals Service.

9

### USMS Demands Additional Color Vision Testing from Marable

34. In August 2013, Plaintiff Marable underwent an annual physical exam and correctly identified zero out of 14 plates on the Ishihara color vision test. Plaintiff Marable submitted the results to Walden, which gave them to the Marshals Service.

35. In January 2014, the Marshals Service issued an MRF to Walden stating that Marable had correctly identified zero out of 14 plates on his August 2013 physical and ordering him to take the Farnsworth D-15 color vision test. The MRF specified that Marable take the Farnsworth D-15 test without the aid of color vision corrective lenses.

36. In February 2014, Plaintiff Marable took the Farnsworth D-15 color vision test and, upon information and belief, failed it. Plaintiff Marable submitted the results to Walden, which gave them to the Marshals Service.

### USMS Demands Additional Color Vision Testing from Yelton

37. In October 2013, Plaintiff Yelton underwent an annual physical exam and correctly identified one out of 14 plates on the Ishihara color vision test. Plaintiff Yelton submitted the results to Walden, which gave them to the Marshals Service.

38. In February 2014, the Marshals Service issued an MRF to Walden stating that Yelton had correctly identified one out of 14 plates on his October 2013 physical and ordering Yelton to take the Farnsworth D-15 color vision test without the aid of color vision lenses.

39. In March 2014, Plaintiff Yelton took the Farnsworth D-15 color vision test and correctly identified seven out of ten plates. The physician who administered the test told Yelton that she did not understand why he was being required to take the test and that she felt with his forty years of law enforcement experience, he was able to do the job of LCSO. Plaintiff Yelton submitted the results to Walden, which gave them to the Marshals Service.

### Walden's Termination of Plaintiffs

40. On or about February 2, 2015, Walden discharged Plaintiff Cribb. In its termination notice to Cribb, Walden stated that the Marshals Service had reviewed his latest medical examination and had determined that he did not meet the requisite medical standards. Enclosed with the termination notice from Walden was a January 30, 2015 MRF from the Marshals Service stating that Cribb was not medically qualified for the CSO position based on his September and December 2014 Ishihara test results.

41. On or about April 17, 2015, Walden discharged Franks. A Walden representative advised Plaintiff Franks orally that he was being removed because of his color vision deficiency. Franks subsequently received an email from a Walden representative stating that the Marshals Service had directed Walden to remove him as CSO. Plaintiff Franks later received a termination notice from Walden stating that the Marshals Service had reviewed his latest medical examination and had determined that he did not meet the requisite medical standards for the CSO position.

42. On or about June 16, 2014, Walden discharged Plaintiff Marable. In its termination notice to Marable, Walden stated that the Marshals Service had reviewed his latest medical examination and had determined that he did not meet the requisite medical standards for the CSO position.

43. On or about June 30, 2014, Walden discharged Plaintiff Yelton. A Walden representative advised Yelton orally that he was being removed because of his color vision deficiency. Yelton subsequently received a termination notice from Walden stating that the Marshals Service had reviewed his latest medical examination and had determined that he did not meet the requisite medical standards for the CSO position.

44. Walden discharged Plaintiffs despite the fact that it knew that Plaintiffs' color vision deficiency had never affected their abilities to safely and efficiently perform the responsibilities of the CSO or LCSO positions.

45. Walden discharged Plaintiffs because they are disabled or because it regarded Plaintiffs as disabled.

**Plaintiffs Have Exhausted Their Administrative Remedies**

46. Plaintiff Cribb timely filed a charge against Walden with the Equal Employment Opportunity Commission ("EEOC"). By letter dated March 18, 2016 the EEOC informed Cribb that he had a right to bring suit within ninety (90) days of the receipt of that letter. This complaint was timely filed within that 90-day period.

47. Plaintiff Franks timely filed a charge against Walden with the EEOC. By letter dated March 10, 2016 the EEOC informed Franks that he had a right to bring suit within ninety (90) days of the receipt of that letter. This complaint was timely filed within that 90-day period.

48. Plaintiff Marable timely filed a charge against Walden with the EEOC. By letter dated March 3, 2016 the EEOC informed Marable that he had a right to bring suit within ninety (90) days of the receipt of that letter. This complaint was timely filed within that 90-day period.

49. Plaintiff Yelton timely filed a charge against Walden with the EEOC. By letter dated April 12, 2016 the EEOC informed Yelton that he had a right to bring suit within ninety (90) days of the receipt of that letter. This complaint was timely filed within that 90-day period.

50. Plaintiffs also filed formal complaints with the Marshals Service's Equal Employment Opportunity Office challenging their removal from the contract by the Marshals Service. The Marshals Service and Plaintiffs have entered into agreements resolving those complaints. Those agreements, which are not confidential, provide for monetary settlements in exchange for Plaintiffs' agreement to not seek reemployment in the Court Security Program and to release the Marshals Service from any causes of action relating to their disability discrimination claims.

## DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

51. Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as if stated herein.

52. In requiring color vision examinations that are not job-related and consistent with business necessity, Walden violated the ADA. 42 U.S.C. §12112(b)(2).

53. In denying Plaintiffs a reasonable accommodation in the form of color vision corrective lenses, Walden violated the ADA. 42 U.S.C. §12112(b)(2).

54. In discharging Plaintiffs, who were fully qualified to carry out the duties of CSO and LCSO, because they are disabled or because it regarded them as disabled, Walden violated the ADA. 42 U.S.C. §12112(b)(2).

55. Walden's unlawful acts were intentional and have caused Plaintiffs emotional distress and harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter a judgment and order:

1. declaring that Walden violated the ADA;

2. granting Plaintiffs equitable relief, including back pay;

   3. awarding Plaintiffs punitive damages, in an amount that a jury may award Plaintiffs as a result of Walden's intentional discrimination;

   4. awarding Plaintiffs compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and such other non-pecuniary damages that they suffered, all in an amount that a jury may award Plaintiffs as a result of Walden's intentional discrimination;

   5. awarding Plaintiffs prejudgment and postjudgment interest;

   6. granting Plaintiffs their attorneys' fees and costs in bringing this action; and

   7. granting Plaintiffs such other and further relief as this Court deems to be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial before a jury on all issues triable to a jury.

Dated: June 1, 2016

/s/ David W. Garrison
David W. Garrison
Scott P. Tift
BARRETT JOHNSTON MARTIN & GARRISON, LLC
Bank of America Plaza
414 Union Street, Suite 900
Nashville, Tennessee 37219
dgarrison@barrettjohnston.com
stift@barrettjohnston.com
(615) 244-2202
(615) 252-3798

Thomas N. Ciantra*
Kate M. Swearengen*
Jonathan F. Harris*
COHEN, WEISS and SIMON LLP
330 West 42nd Street

New York, New York 10036
(212) 563-4100
(212) 695-5436

Attorneys for Plaintiffs

*Pro hac vice* applications pending.